Filed 8/12/16  P. v. Leavy CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARQUISE D. LEAVY,<br><br>    Defendant and Appellant. | F069687<br><br>(Fresno Super. Ct. No. F12904662)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Max Feinstat, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Appellant/defendant Marquise D. Leavy (defendant), a member of the Hoover Crips gang, used a shotgun to commit a drive-by shooting at two brothers, Maurice and

Marquise Graves, who were affiliated with the rival Northside gang. Maurice Graves was killed and Marquise was wounded.

After a jury trial, defendant was convicted of count I, first degree murder of Maurice Graves (Pen. Code, §187, subd. (a))[1] with two special circumstances: the murder was committed by intentionally discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)); and the murder was intentional, defendant was an active participant in a criminal street gang, and it was committed to further the activities of a criminal street gang (§ 190.2, subd. (a)(22)). Defendant was also convicted of count II, attempted premeditated murder of Marquise Graves (§ 187, subd. (a)), § 664, subd. (a)), with firearm enhancements found true for both counts (§ 12022.53, subd. (d)).[2]

Defendant was 16 years old when he committed the murder. As we will discuss below, the United States Supreme Court has held that the Eighth Amendment to the federal Constitution prohibits a mandatory life without parole (LWOP) sentence for a juvenile offender who commits homicide; the sentencing court must have individualized discretion to impose a less severe sentence; and in exercising that discretion, the court must take into account specific youth-related mitigating factors. (*Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455, 2460, 2468–2469] (*Miller*).)

At the sentencing hearing in this case, the court made lengthy findings pursuant to *Miller* and declined to sentence defendant to an LWOP term. Instead, the court sentenced him to 25 years to life for count I, first degree murder; a consecutive term of 25 years to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The information also alleged gang enhancements for both counts (§ 186.22, subd. (b)(1)). However, the court dismissed the gang allegations after the jury was discharged, when it realized the jury failed to make any findings on those allegations because the verdict forms were never sent to the jury room.

life for the firearm enhancement; life with the possibility of parole for count II, attempted murder; plus 25 years to life for the second firearm enhancement.[3]

In his opening appellate brief, defendant argued his sentence was the functional equivalent of an LWOP term, and violated the Eighth Amendment and *Miller*.

While this case was pending on appeal, the California Supreme Court addressed and rejected the identical arguments in *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*). Thereafter, we asked the parties for further briefing. Defendant acknowledged the holding in *Franklin*, argued that it was wrongly decided, and requested remand of his case for further sentencing proceedings.

While defendant's constitutional challenges to his sentence have been rejected in *Franklin*, we order a limited remand of the matter for additional proceedings out of an abundance of caution – not to modify his sentence, but to preserve the record in anticipation of defendant's eventual section 3051 parole hearing in the 25th year of his incarceration. We also direct the abstract of judgment be corrected as explained below.

## FACTS

Marquise "Sleepy" Graves (Marquise) and his brother Maurice "Juice" Graves (Maurice)[4] were members of the Pleasant gang, which was affiliated with the Northside gang. Marquise, who survived the shooting and testified at defendant's trial, knew their gang was having issues with the Hoover gang.

Marquise testified that he and his brother did not know defendant and/or defendant's 12-year-old brother, Lorenzo Leavy (Lorenzo). They had never confronted

---

[3] In contrast to the court's oral pronouncement of judgment, the abstract of judgment and minute order erroneously state that defendant's aggregate term was life with parole plus 50 years to life. We order the trial court to correct the abstract of judgment on remand.

[4] Since several parties have the same last name, we will refer to certain people by their first names for ease of reference; no disrespect is intended.

or pulled a gun on either of them. Marquise further testified they never had any type of confrontation with someone from the Hoover gang.

Defendant and his brother, Lorenzo, were part of the Hoover Crips gang. Lorenzo testified they had problems with rival gang members who lived in their apartment complex.

**The murder**

Around 11:45 p.m. on June 24, 2012, Marquise and Maurice were walking home on West Robinson Avenue near Atlas Way in Fresno. Marquise testified that he and his brother were not carrying weapons that night.

Mauquise testified that a car pulled up and stopped on the street in front of them. At trial, Marquise testified he did not recognize the car and could not clearly see the number of occupants. Shortly after the murder, however, Marquise told the police that he saw three African-Americans in the car: a woman was driving, and two men were with her.

Marquise testified that someone in the car yelled "North," representing Northside. Marquise believed the person in the car was trying to lure them closer by making them think the occupants were friendly. Marquise later decided that the person who shouted "North" was not from the Northside gang, and it was "just a front."

Marquise testified that he and his brother stopped walking. Within a few seconds, a shot was fired at them from the car's backseat, behind the driver's seat. The bullet fragments grazed Marquise's chest, and both brothers tried to run away. Marquise testified he heard a second shot and Maurice fell down. Marquise turned back and tried to help his brother.

Michelle Martinelli lived in the neighborhood and was standing outside her apartment. She saw a light colored car, possibly white or silver, slowly drive down the street and then stop. A few moments later, she heard a gunshot and saw a flash of light

4.

from the car. She ran inside her residence. About five seconds later, she heard a second gunshot. The vehicle sped away and she called 911.

**The fatal wound**

The police responded to the scene and found Maurice lying face down on the ground, bleeding from a shotgun wound. Marquise was holding Maurice's body, and he was very emotional.

Marquise suffered a nonfatal chest wound from a shotgun slug that grazed his body.

Emergency personnel transported Maurice to the hospital, where he died from wounds inflicted by a single shotgun slug, which entered the left side of his spine. The slug went through Maurice's spinal cord and ribs, damaged the right lung, and lodged in his right chest.

An expended shotgun shell casing was found at the murder scene.

There was an imprint found on the back of Maurice's right elbow, which was consistent with being made by a shotgun wad, the packaging material for a slug inside a shotgun shell. The wadding did not penetrate Maurice's body, which indicated that the weapon would have been as close as 12 to 15 feet from him when it was fired.

**The investigation**

On June 25, 2012, the day after the murder, the police obtained a videotape from a security camera at an apartment complex near the crime scene. Officer Chris Serrano testified the videotape showed a vehicle at the intersection of Atlas and West Robinson at 11:47 p.m. The car made a slight turn and stopped, and the vehicle's lights were still on. A flash was visible from the car's interior, followed by a second flash from the interior, consistent with a shotgun being discharged. The car made a U-turn and left the scene.

Also on June 25, 2012, Officer Serrano learned of a "Crime Stoppers" tip regarding the murder. He conducted a records search and found a report of a stolen vehicle, which was relevant to the tip.

5.

Based on that information, Officer Serrano contacted Latasha "Chloe" Fradue (Fradue). She had filed a report at 12:51 p.m. on June 25, 2012, that her rented silver Ford sedan had been stolen. Serrano issued an "all points bulletin" for the vehicle, indicating it was associated with defendant and the murder of Maurice.

At approximately 6:30 p.m., Officer Tim Sullivan saw the car parked in front of a house on South Weldon. Defendant was sitting in the driver's seat, and three other people were in the car. Defendant was taken into custody without incident for possession of a reported stolen car. Defendant's brother, Lorenzo, was not in the car.

Officer Serrano testified the other three occupants of the car were questioned about the murder and released. The car was searched, but the officers did not find any firearms, ammunition, gunshot residue, or forensic evidence connected to the murder.

**Defendant's postarrest interview**

Officer Serrano met defendant at the police department and conducted a recorded interview with him around midnight on June 26, 2012. Defendant was 16 years old (born 1995). Serrano advised defendant of the *Miranda*[5] warnings, and defendant agreed to answer questions.

Officer Serrano asked defendant about the car. Defendant said he borrowed the car from Chloe Fradue without her permission.

Officer Serrano asked defendant if he had been in that car on the night of June 24, 2012. He also asked defendant about the shooting on West Robinson. Defendant said he was not there at that time. He didn't take Fradue's car until around 11:00 a.m. on June 25, 2012, and his brother, Lorenzo, was with him.

On further questioning, defendant changed his story and said he was a passenger in the front seat of Fradue's car, and he was at the intersection of West Robinson and Atlas. He would not reveal the driver's name.

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

6.

Officer Serrano asked defendant if he had seen Maurice and Marquise Graves. Defendant again changed his story and said he was the driver and no one else was with him. Defendant said he saw the two men walking on the street. Defendant said he recognized the men, but he did not know their names. A few weeks earlier, two African-American males in a car had confronted defendant's brother in the same area. The men said they were in the Northside gang, and they thought Lorenzo was in the rival Hoover gang. One of the men, who had braids, pulled a gun and chased Lorenzo out of the area.

Defendant said when he saw the two men on the street that night, he thought they were the same Northside men who had confronted Lorenzo because they also had braids. Defendant said a shotgun was in the car trunk. Fradue had bought it about a week earlier. Defendant reached through the backseat cushions into the trunk, and pulled the shotgun into the car's passenger compartment. Defendant decided he was going to scare the two men with the shotgun.

Defendant said he drove up to the two men and spoke to them through the front passenger window. He asked if they had pulled a gun on his brother. The men asked defendant for his brother's name. Defendant replied his brother's name was Lorenzo. The men said yes. Defendant said the men argued with him.

Defendant became mad and raised the shotgun, but he put the safety on. He pointed the shotgun out of the front passenger window, pulled the trigger, and it made a "click" sound. The two men started to run away. Defendant said one man (later identified as Marquise) stopped and looked back at the car. This man told the second man (later identified as Maurice) to stop running because the gun was malfunctioning.

Defendant said he continued to pull the trigger to make the clicking sound because the safety was on, but the shotgun discharged. The gun recoiled and hit defendant in the forehead. Officer Serrano testified that he noticed a fresh abrasion on defendant's forehead, consistent with such a motion.

7.

Defendant said he was dazed from the gun hitting him in the forehead. His finger continued to depress the trigger, and the gun went off by itself and discharged a second shot. Defendant said one man immediately fell to the ground.

Officer Serrano testified that defendant said he pulled the trigger three times and heard the "click" sound. Defendant claimed that he never turned off the safety, but the admitted the gun discharged twice.

Defendant said he drove away and returned to Fradue's house. He left the car there, and then walked home and took a shower. He later returned to Fradue's house and told her what happened. Fradue said she was going to return the rental car. She never said she was going to report it stolen. Defendant said he gave the shotgun to someone who knew Fradue and/or her father, and the weapon was now "somewhere far out there like the country."

Officer Serrano asked defendant to describe the shotgun. Defendant said Fradue bought it, and it was a "rusty old gun." The barrel was chopped off, it had a pistol grip, and it was about two feet long. Serrano asked defendant if either of the two victims had a weapon, and defendant said no. Serrano asked if he spoke to one particular man. Defendant said he primarily talked to the man who survived, later identified as Marquise.

At the conclusion of the interview, Officer Serrano asked defendant if he wanted to write a letter to the victim's family about what happened. Defendant agreed, and said he never meant to shoot him.

**The cell phone photographs of a shotgun**

The shotgun used to shoot the victims was never found.

The police examined Fradue's cell phone and found five photographs of a shotgun, with date-stamps of June 20, 2012. A firearms expert examined the photographs and testified that weapon was consistent with a Remington 870 Wingmaster 12-gauge pump-action shotgun, with "after-market conversions." It had been altered to remove the back end of the stock; it had a pistol grip and a "side saddle" attached to the side of the

8.

weapon which contained live ammunition. The gun had to be "racked" or pumped to chamber a live round. Once the round was fired, the shotgun could not be fired again simply by pulling the trigger. The shotgun had to be racked again to chamber the next live round, and then it could be fired.

The expert testified the expended shell found at the murder scene appeared to be a 12-gauge shell, consistent with being ejected when a shotgun was racked. The weapon in the cell phone photographs was capable of firing 12-gauge shotgun shells, which could have contained either a slug or pellets.

## Defendant's statements about the shotgun

Officer Serrano conducted another interview with defendant and showed him the cell phone photographs of the shotgun. Defendant had never seen the pictures, but he said the shotgun in the photographs was the firearm he used that night.

## Lorenzo Leavy's pretrial statement

On June 29, 2012, Officer Serrano interviewed Lorenzo, defendant's brother. Lorenzo was 12 years old at the time, and he was not aware the interview was being recorded. Serrano advised Lorenzo of the *Miranda* warnings, and Lorenzo agreed to answer questions.

Officer Serrano told Lorenzo that they had already talked to his brother (defendant), who said that something happened to Lorenzo a few weeks earlier. Lorenzo said a car drove up to him, someone pulled a gun, and he ran away.

As for the shooting, Lorenzo said he wasn't there when it happened, but defendant told him about it. Defendant and Lorenzo spent the night of the shooting at Fradue's house. The next morning, defendant and Lorenzo left in Fradue's car. During the drive, defendant told Lorenzo that he was with Fradue the previous night. Defendant said Fradue was driving and he was in the backseat.[6] Defendant said they saw two Northside

_____

[6] Marquise told the police that a female was driving and there were two men in the car. At trial, Marquise testified that he thought the gunshot was fired from the backseat.

9.

guys, and Fradue told him to get the gun. Defendant said the shotgun belonged to Fradue. Defendant told Lorenzo that the two guys were "banging out North," and defendant argued with them. Defendant told Lorenzo that he decided to shoot them, he tried to fire, but the shotgun was on safety. Defendant said he fired twice and shot someone. Lorenzo knew that someone had been killed.

**Lorenzo's trial testimony**

Lorenzo was 14 years old when he testified at defendant's trial. Lorenzo testified about an incident that occurred several months before the murder, when he was walking home from school with two girls. Someone tapped him on the shoulder. Lorenzo turned around and saw two men with a gun, and two more men standing behind them. Lorenzo immediately ran away. A car was not involved in this incident.

Lorenzo testified that about three or four months later, he was walking down the street when a car pulled in front of him. Two men with braids jumped out. They had a gun and told Lorenzo not to run. Lorenzo ran away into an apartment complex.

Lorenzo admitted that he and his brother were part of the Hoover Crips gang, and they had been having problems with rival gang members who lived in their apartment complex. Lorenzo testified he was with defendant when they had another encounter with rival gang members at a convenience store.

Lorenzo testified he and defendant stayed at Fradue's house on June 24, 2012, and they borrowed Fradue's car the next morning. Lorenzo denied that he told the police that defendant said he shot someone the previous night. When Lorenzo learned his interview had been recorded, he claimed the police told him what to say. He also claimed the recording was a "made-up video" that had been altered to make it sound like he said certain things.

**Expert testimony**

Officer Ron Flowers testified as the prosecution's gang expert. In his opinion, defendant was a member of the 107 Hoover Crips, based on defendant's tattoos, prior

10.

arrests, and association with other Hoover gang members. The 107 Hoover Crips was a "stand-alone" gang.

Officer Flowers believed Maurice and Marquise Graves were affiliated with the Pleasant gang, which was part of the Northside gang. Flowers testified that the Pleasant and Northside gangs were having problems with the Hoover gang at the time of the murder.

## SENTENCING PROCEEDINGS

As explained above, defendant was 16 years old when he committed the crimes in this case. He was tried as an adult and convicted of first degree murder with two special circumstances. We now turn to the applicable legal principles relevant to defendant's sentence, and the trial court's findings in this case.

### *Roper, Graham, Miller and Caballero*

There are a series of cases which limit the sentence which may be imposed on a juvenile offender. The death penalty may not be imposed on juvenile offenders. (*Roper v. Simmons* (2005) 543 U.S. 551, 578 (*Roper*).) A juvenile who commits a nonhomicide offense may not be sentence to LWOP. (*Graham v. Florida* (2010) 560 U.S. 48, 74 (*Graham*).)

In *Miller*, the United States Supreme Court held that a juvenile who commits a homicide offense may not be automatically sentenced to an LWOP term. (*Miller*, *supra*, 132 S.Ct. at p. 2460.) *Miller* held that the sentencing authority must have individualized discretion to impose a less severe sentence and, in exercising that discretion, must take into account the following youth-related mitigating factors. (*Id.* at pp. 2468–2469.)

> "Mandatory life without parole for a juvenile precludes consideration of *his chronological age and its hallmark features* – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account *the family and home environment that surrounds him* – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional. It neglects *the circumstances of the homicide offense*, including the extent of his participation in the conduct and the way familial

11.

and peer pressures may have affected him.  Indeed, it ignores *that he might have been charged and convicted of a lesser offense* if not for [the] incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.  [Citations.]  And finally, this mandatory punishment disregards *the possibility of rehabilitation* even when the circumstances most suggest it."  (*Miller, supra,* 132 S.Ct. at p. 2468, italics added.)

Shortly after the decision in *Miller*, the California Supreme Court held in *People v. Caballero* (2012) 55 Cal.4th 262, 265, 268 (*Caballero*) that a juvenile defendant's sentence of 110 years to life for three counts of attempted murder was the "functional equivalent" of an LWOP term, and violated *Graham's* prohibition against LWOP sentences for juvenile offenders convicted of nonhomicide offenses.

Just before defendant was sentenced in this case, the California Supreme Court held in *People v.Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*), that a sentencing court has discretion to sentence a juvenile convicted of first degree murder with special circumstances to LWOP or 25 years to life, with no presumption in favor of life without parole.  *Gutierrez* held that *Miller* requires the court, "in exercising its sentencing discretion, to consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender.  [Citation.]" (*Gutierrez*, *supra*, 58 Cal.4th at p. 1361.)

*Gutierrez* further held that in considering whether to impose an LWOP term, a sentencing court must consider the five factors enumerated in *Miller* (as italicized above): (1) the inherent impact of the juvenile's age on his culpability; (2) the juvenile's home and family environment; (3) the circumstances of the homicide offense; (4) the juvenile's ability to deal with law enforcement officers and prosecutors as well as effectively assist in his own defense; and (5) the possibility of rehabilitation.  (*Gutierrez, supra,* 58 Cal.4th at pp. 1389–1390.)

12.

**Section 3051**

*Caballero* urged the Legislature "to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity." (*Cabellero*, *supra*, 55 Cal.4th at p. 269, fn. 5.)

In response to *Miller*, *Graham*, and *Caballero*, the California Legislature passed Senate Bill No. 260, which became effective January 1, 2014, and enacted sections 3051, 3046, subdivision (c) and 4801, subdivision (c). The express purpose of the legislation was to provide a parole eligibility mechanism in accordance with the decisions in these cases. (*Franklin*, *supra*, 63 Cal.4th at p. 277; Stats. 2013, ch. 312, § 1; see Historical and Statutory Notes, 51B pt. 2, West's Ann. Pen. Code (2015 supp.) foll. § 3041, pp. 78–79.

"At the heart of Senate Bill No. 260 was the addition of section 3051, which requires the Board [of Parole Hearings] to conduct a 'youth offender parole hearing' during the 15th, 20th, or 25th year of a juvenile offender's incarceration. (§ 3051, subd. (b).) The date of the hearing depends on the offender's ' "controlling offense," ' which is defined as 'the offense or enhancement for which any sentencing court imposed the longest term of imprisonment.' (*Id.,* subd. (a)(2)(B).) A juvenile offender whose controlling offense carries a term of 25 years to life or greater is 'eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions.' (*Id.,* subd. (b)(3).) The statute excludes several categories of juvenile offenders from eligibility for a youth offender parole hearing: those who are sentenced under the 'Three Strikes' law (§§ 667, subds. (b)–(i), 1170.12) or Jessica's Law (§ 667.61), those who are sentenced to life without parole, and those who commit another crime 'subsequent to attaining 23 years of age ... for which malice aforethought is a necessary element of the crime or for which the individual is sentenced

13.

to life in prison.'  (§ 3051, subd. (h); see Stats. 2015, ch. 471, § 1 [changing the age after which malice aforethought crimes are disqualifying from 18 to 23].)"  (*Franklin*, *supra*, 63 Cal.4th at pp. 277–278.)

"Section 3051 thus reflects the Legislature's judgment that 25 years is the maximum amount of time that a juvenile offender may serve before becoming eligible for parole.  Apart from the categories of offenders expressly excluded by the statute, section 3051 provides all juvenile offenders with a parole hearing during or before their 25th year of incarceration.  The statute establishes what is, in the Legislature's view, the appropriate time to determine whether a juvenile offender has 'rehabilitated and gained maturity' (Stats. 2013, ch. 312, § 1) so that he or she may have 'a meaningful opportunity to obtain release' (§ 3051, subd. (e))."  (*Franklin*, *supra*, 63 Cal.4th at p. 278.)

**Defendant's sentencing statement**

On April 16, 2014, after defendant was convicted, defense counsel filed a sentencing statement and acknowledged that defendant faced an LWOP term for his conviction of first degree murder with special circumstances.  Counsel argued a mandatory LWOP term for a juvenile offender violated the Eighth Amendment, multiple life terms would be the functional equivalent of an LWOP term, and consideration of the *Miller* factors weighed in favor of a prison term which allowed for the possibility of parole within defendant's lifetime.

In support of his motion, counsel attached defendant's educational and disciplinary records and argued:

> "[Defendant's] lack of maturity, even for his age, is evidence from his poor attendance and frequent disturbances in class.  This undeveloped sense of responsibility is exhibited by reckless and impulse behavior.  [Defendant] has been disciplined for taking and hiding the teacher's radio, refusing to turn the volume down while using the computer, making disruptive comments, and for fighting with others.  His discipline records reflect his reckless and often impulsive behavior.

"Additionally, [defendant] suffered from the environment in which he grew up and was unable to change his environment or his circumstances. [Defendant's] parents passed away when he was a child. His parents did not provide for any support for him or his siblings in their absence and in turn [defendant] grew up without any parental guidance. His sister, 8 years his senior, took care of him as best she could, but even she was involved in the gang lifestyle. [Defendant] did have a great aunt that was noted in his school records from time to time, but due to her age and her blindness she was unable to care for him. As a result, most of his time was spent living on the streets of Fresno.

"[Defendant] has displayed the ability to improve and excel during his middle school and high school career. [Defendant] went from failing all classes in his seventh grade spring semester to maintaining A's and B's during his ninth grade summer semester. His student transcript reflects his poor performance in academics, but also reflects his ability to change and to succeed. Although, he was enrolled in special education courses, at the age of fifteen his reading comprehension was that of a 7th or 8th grader. It appears that [defendant] could perform well in the structured environment of a classroom. His teachers noted his ability to follow along in class, his ability to work well with others, to follow directions, and to participate. They also noted his need for confidence, practice of the subject matter, and that often he was so embarrassed by his mistakes that he would give up."

Defense counsel concluded that defendant's appreciation of the gravity of his actions was "hindered by his lack of maturity, impulsivity and underdeveloped sense of responsibility. [Defendant] grew up without his parents in a neighborhood fraught with gang activity and his own sister who cared for him was involved in the gang lifestyle. [Defendant] had no other relatives that could care for him and was therefore restricted to the circumstances he found himself in. His good grades and positive comments from his educators demonstrate his ability to change and to excel in a structured environment."

**Probation report**

Defendant told the probation officer that his mother was in prison for six to seven years because she " 'cut a police [officer].' " Defendant lived with various family and friends until his mother's release. When his mother died, defendant lived with his 20-

year-old sister for a while.  At the time of the offenses, defendant said he lived with family friends and " 'it was just crazy.' "

The probation report summarized the police reports about the murder, and stated that Fradue reported the rental car was stolen to conceal that it was used in the murder.

**The sentencing hearing**

On June 2, 2014, the court conducted the sentencing hearing and stated it was inclined not to impose an LWOP term.  Defense counsel repeated the arguments raised in the sentencing statement and did not move to introduce additional evidence about defendant.

Defense counsel argued even if the court imposed multiple terms of 25 years to life, it would still constitute a de facto life sentence that was unconstitutional under *Miller* and *Graham*.  Counsel asked the court to impose concurrent instead of consecutive sentences.

The court asked defense counsel about the potential applicability of section 3051 to defendant's sentence.  Counsel replied that section 3051 reflected the current state of the law and provided for defendant to appear before a parole board in 25 years, but argued that the constitutionality of the statute had not been resolved.

The court stated it had reviewed *Miller*, *Gutierrez*, and *Caballero*, and considered defendant's sentencing statement.  The court declined to sentence defendant to LWOP for first degree murder with special circumstances.

> "[W]eighing the five factors set forth in *Gutierrez* and *Miller*, the Court believes that the exercise of its discretion when considering life without the possibility of parole for a first degree murder conviction of a juvenile, 16 or 17 years old, and particularly in this case, that the factors weigh heavily in favor of imposing the term of 25 years to life …."

The court sentenced defendant to 25 years to life for count I, first degree murder; a consecutive term of 25 years to life for the firearm enhancement; life with the possibility of parole for count II, attempted premeditated murder; plus 25 years to life for the second

16.

firearm enhancement, for an aggregate sentence of three consecutive terms of 25 years to life plus life with the possibility of parole. The court declined defendant's request to impose concurrent terms because there were two separate shots fired at two separate victims.

**The court's sentencing findings**

After the court imposed the sentence, it made extensive findings under *Miller* and *Gutierrez*, and explained why it declined to impose an LWOP term, and instead sentenced defendant to multiple terms of 25 years to life.

First, the court noted defendant was 16 years at the time of the offenses. It reviewed his academic record, which was attached to defendant's sentencing statement, and said that defendant's disciplinary record at school demonstrated "an immaturity and a failure to appreciate consequences."

Second, the court considered defendant's family home environment. Defendant told the probation officer that his mother was in prison for assaulting an officer, and his upbringing was crazy. The sentencing statement mentioned that defendant lost his mother and father when he was young, but it was "never made clear in anything that the Court read or the evidence at trial approximately when that took place. But it is clear the defendant did grow up for a large portion of his life without the benefit of a sustainable family structure," and "that he was taken from home to home, from family member to family member during the time of his upbringing."

Third, the court looked at the circumstances of the homicide. While defendant was "clearly" the shooter, the court believed that Fradue "had a great deal of influence on what happened in this case" because defendant used her car and gun, and defendant and his brother were with Fradue before and after the shooting. The court believed that, based on the trial evidence, Fradue "was probably at the scene of the shooting and may have been the driver of the vehicle while defendant was in the passenger seat," and the court believed "there was an exertion of pressure" on defendant to carry out the offense.

17.

The court believed defendant used controlled substances, but dismissed defendant's statement to the probation officer, that he consumed 1.5 pints of Hennessy and four Ecstasy pills on the day of the crime, and used cocaine and heroin on a daily basis. The court found it difficult to believe that defendant was able to finance the use of such a large amount of substances.

Fourth, the court considered "evidence of incompetencies" and his inability to deal with officers or assist counsel. The court said that defendant's recorded interview showed his immaturity and lack of sophistication dealing with law enforcement and serious issues. There was no information about any inability to assist counsel.

Finally, the court looked at the possibility of rehabilitation, and noted defendant did not have any criminal history.

The court concluded:

> "[C]onsideration of these five factors under *Miller* and *Gutierrez* point to a diminished and illogical justification for imposing the harshest sentence that a Court could impose on a juvenile offender, and in this instance, that would be life without the possibility of parole…. [A]fter the Court has considered all of those factors and for the very specific reasons stated, the Court selected in the exercise of its discretion … the 25-years-to-life sentence rather than life without the possibility of parole."

## APPELLATE CONTENTIONS

In his opening brief on appeal, defendant argued his sentence must be reversed because he was 16 years old at the time of the offenses, and the sentence of 75 years to life (plus life for attempted murder) was the functional equivalent of an LWOP term. Defendant argued such a term for a juvenile offender violated the Eighth Amendment and was unconstitutional pursuant to *Miller*, because it did not provide for a meaningful opportunity for parole.

Defendant argued the court failed to adequately consider or discuss the "*Miller* factors" when it sentenced him, such as the "hallmark features of youth," his background

18.

and upbringing, mental and emotional development, and possibility of rehabilitation.[7] Defendant further argued the court never considered the possibility of imposing a sentence less than 50 years to life for count I.

Defendant acknowledged that section 3051 had been enacted to provide youthful offenders with parole hearings after serving 25 years. Defendant asserted the procedures established by section 3051 did not "cure" the alleged constitutional errors in his sentence. "A sentence which puts off such considerations and transfers them to the possibility of a parole board 25 years into the future is completely at odds" with the Eighth Amendment.

Defendant argued the matter must be remanded for the court to consider the *Miller* factors and impose a sentence of less than 50 years to life for count I to conform to the Eighth Amendment. Defendant acknowledged that several cases addressing these issues were pending before the California Supreme Court.

### *FRANKLIN*

While this case was pending on appeal, the California Supreme Court decided *People v. Franklin, supra,* 63 Cal.4th 261, which has addressed and rejected the same issues raised in this appeal.

In *Franklin*, the defendant was convicted of first degree murder; he was 16 years old when he committed the offense. His sentencing hearing occurred before *Miller* and *Caballero* were decided, and the court was obligated by statute to impose two consecutive terms of 25 years to life. On appeal, the defendant challenged the constitutionality of his aggregate term of 50 years to life. (*Franklin*, *supra*, 63 Cal.4th at p. 268.)

---

[7] The record completely undermines this assertion, given the court's extensive analysis of defendant's specific circumstances under the *Miller* factors.

*Franklin* explained that since *Miller* and *Graham* were decided, "courts throughout the country have examined whether the high court's restrictions on LWOP sentences apply to lengthy sentences with a release date near or beyond a juvenile's life expectancy." (*Franklin*, *supra*, 63 Cal.4th at p. 275.) *Franklin* noted that *Caballero* reached the conclusion that a juvenile defendant's sentence of 110 years to life "was the 'functional equivalent' of life without parole and thus violated *Graham's* prohibition against LWOP sentences for juvenile offenders convicted of nonhomicide crimes. [Citations.] But we did not further elaborate what it means for a sentence to be the 'functional equivalent' of LWOP, and we left open how our holding should be applied in the case of a juvenile homicide offender. [Citation.]" (*Franklin*, *supra*, at pp. 275–276.)

> "We now hold that just as *Graham* applies to sentences that are the 'functional equivalent of a life without parole sentence' [citation], so too does *Miller* apply to such functionally equivalent sentences. As we noted in *Caballero, Miller* 'extended *Graham's* reasoning' to homicide offenses, observing that ' "none of what [*Graham* ] said about children – about their distinctive (and transitory) mental traits and environmental vulnerabilities – is crime-specific." ' [Citation.] Because sentences that are the functional equivalent of LWOP implicate *Graham's* reasoning [citation], and because ' "*Graham's* reasoning implicates any life-without-parole sentence imposed on a juvenile" ' whether for a homicide or nonhomicide offense [citation], a sentence that is the functional equivalent of LWOP under *Caballero* is subject to the strictures of *Miller* just as it is subject to the rule of *Graham. In short, a juvenile may not be sentenced to the functional equivalent of LWOP for a homicide offense without the protections outlined in Miller*." (*Id.* at p. 276, italics added.)

*Franklin* further held that the enactment of section 3051 entitled a juvenile defendant to a parole hearing in his 25th year in prison, and thus rendered moot "any infirmity in [his] sentence under *Miller*." (*Franklin*, *supra*, 63 Cal.4th at p. 276.)

> "[S]ection 3051 has superseded [the defendant's] sentence so that notwithstanding his original term of 50 years to life, he is eligible for a 'youth offender parole hearing' during the 25th year of his sentence. Crucially, the Legislature's recent enactment also requires the Board not just to consider but to 'give great weight to the diminished culpability of

juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law.' (§ 4801, subd. (c).) For those juvenile offenders eligible for youth offender parole hearings, the provisions of Senate Bill No. 260 are designed to ensure they will have a meaningful opportunity for release no more than 25 years into their incarceration." (*Id.* at p. 277.)

*Franklin* held that section 3051 did not "envision that the original sentences of eligible youth offenders would be vacated and that new sentences would be imposed to reflect parole eligibility during the 15th, 20th, or 25th year of incarceration." (*Franklin*, *supra*, 63 Cal.4th at p. 278.)

> "The continued operation of the original sentence is evident from the fact that an inmate remains bound by that sentence, with no eligibility for a youth offender parole hearing, if 'subsequent to attaining 23 years of age' the inmate 'commits an additional crime for which malice aforethought is a necessary element ... or for which the individual is sentenced to life in prison.' (§ 3051, subd. (h); Stats. 2015, ch. 471.) But section 3051 has changed the manner in which the juvenile offender's original sentence operates by capping the number of years that he or she may be imprisoned before becoming eligible for release on parole. The Legislature has effected this change by operation of law, with no additional resentencing procedure required. [Citation.]" (*Id.* at pp. 278–279.)

Franklin thus concluded that defendant's constitutional challenge to his sentence was moot. (*Franklin*, *supra*, 63 Cal.4th at p. 280.)

> "In sum, the combined operation of section 3051, section 3046, subdivision (c), and section 4801 means that [the defendant] is now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration. Such a sentence is neither LWOP nor its functional equivalent. Because [the defendant] is not serving an LWOP sentence or its functional equivalent, no *Miller* claim arises here. The Legislature's enactment of Senate Bill No. 260 has rendered moot [the defendant's] challenge to his original sentence under *Miller.*" (*Id.* at pp. 279–280.)[8]

---

[8] *Franklin* is consistent with *Montgomery v. Louisiana* (2016) 577 U.S. __ [136 S.Ct. 718, 736], which held: "A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. [Citation.] Allowing those offenders to be considered for parole ensures that

21.

## *Remand for further sentencing hearing*

While *Franklin* affirmed defendant's sentence in light of section 3051, it held the matter had to be remanded for further proceedings since his sentencing hearing was held before *Miller* and *Caballero* were decided. *Franklin* explained it was not clear whether defendant had "sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Franklin*, *supra*, 63 Cal.4th at p. 284.)

"Senate Bill No. 260 directs the administrative entity that will determine if and when [a juvenile defendant] is released to 'give great weight' (§ 4801, subd. (c)) to the salient characteristics of youth outlined in *Miller, Graham*, and *Caballero*." (*Franklin*, *supra*, 63 Cal.4th at p. 282.) "The Legislature has declared that '[t]he youth offender parole hearing to consider release shall provide for a meaningful opportunity to obtain release' (§ 3051, subd. (e)) and that in order to provide such a meaningful opportunity, the Board 'shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity' (§ 4801, subd. (c)). These statutory provisions echo language in constitutional decisions of the high court and this court. [Citations.] The core recognition underlying this body of case law is that children are, as a class, 'constitutionally different from adults' due to 'distinctive attributes of youth' that 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.] Among these 'hallmark features' of youth are 'immaturity, impetuosity, and failure to appreciate risks and consequences,' as well as the capacity for growth and change. [Citation.] It is because of these 'marked and well understood' differences between children and adults [citation] that the law categorically prohibits the imposition of certain penalties, including

---

juveniles whose crimes reflected only transient immaturity – and who have since matured – will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment."

22.

mandatory LWOP, on juvenile offenders.  [Citation.]"  (*Franklin*, *supra*, 63 Cal.4th at p. 283.)

> "In directing the Board to 'give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner' (§ 4801, subd. (c)), the statutes also contemplate that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration.  For example, section 3051, subdivision (f)(2) provides that '[f]amily members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime ... may submit statements for review by the board.'  *Assembling such statements 'about the individual before the crime' is typically a task more easily done at or near the time of the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away.  [Citation.]  In addition, section 3051, subdivision (f)(1) provides that any 'psychological evaluations and risk assessment instruments' used by the Board in assessing growth and maturity 'shall take into consideration ... any subsequent growth and increased maturity of the individual.'  Consideration of 'subsequent growth and increased maturity' implies the availability of information about the offender when he was a juvenile*.  [Citation.]"  (*Id.* at pp. 283–284, italics added.)

*Franklin* ordered a limited remand "[i]n light of the changed legal landscape" after the decisions in *Miller* and *Caballero* "so that the trial court may determine whether [the defendant] was afforded sufficient opportunity to make such a record at sentencing.  This remand is necessarily limited; as section 3051 contemplates, *[defendant's] two consecutive 25-years-to-life sentences remain valid, even though the statute has made him eligible for parole during his 25th year of incarceration*."  (*Franklin*, *supra*, 63 Cal.4th at p. 269, italics added.)

*Franklin* explained that if the trial court determined that defendant did not have sufficient opportunity, "then the court may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 and rule 4.437 of the

California Rules of Court, and subject to the rules of evidence. [The defendant] may place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors. *The goal of any such proceeding is to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense* so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors (§ 4801, subd. (c)) in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law' [citation]." (*Franklin*, *supra*, 63 Cal.4th at pp. 284, italics added.)

## DISCUSSION

In light of *Franklin*, this court asked the parties for briefing on the impact of the decision on the issues raised in this appeal. Defendant submitted a letter brief and argued that *Franklin* was wrongly decided, his sentence still violated *Miller* and the Eighth Amendment, and maintained his right to the benefit of any subsequent decisions which were contrary to *Franklin*.

We decline defendant's request to find *Franklin* was wrongly decided. We agree with and, indeed, are required to follow the holding in *Franklin*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Defendant's sentence of 75 years to life, plus life with parole, does not violate the Eighth Amendment given section 3051's provision for a parole hearing in his 25th year of incarceration. (*Franklin*, *supra*, 63 Cal.4th at pp. 278–279.) We note defendant has preserved any issues that might arise should *Franklin* be reversed or overruled.

Also in his post-*Franklin* letter brief, defendant asserts the sentencing court in this case "gave little more than lip service to the now settled notion" that a court "may not

24.

sentence a youthful offender to a term of imprisonment which does not provide for a meaningful opportunity for parole without consideration of the '*Miller* factors.' " Defendant raised a similar issue in his pre-*Franklin* opening brief, when he argued the court failed to adequately consider or discuss the *Miller* factors when it sentenced him, such as the "hallmark features of youth," his background and upbringing, mental and emotional development, and possibility of rehabilitation.

These assertions are baseless and completely refuted by the record. As set forth above, the sentencing court gave much more than "lip service" to its constitutional duty in this case. It made lengthy findings as to each of the five *Miller* factors, and discussed defendant's difficult family life, substance abuse, and immaturity. The court explained the reasons why it declined to impose an LWOP term, it was well aware of section 3051's application to defendant's case, and sentenced defendant to multiple terms of 25 years to life.

Which leads us to defendant's alternate argument, that he should receive the same limited remand provided in *Franklin* to give him a sufficient opportunity "to make a record of information relevant to his eventual youth offender parole hearing, and to receive submissions and, if appropriate, testimony" pursuant to procedures set forth in the California Rules of Court and subject to the rules of evidence.

The People assert a remand is not necessary in this case. The People correctly note that such a remand was necessary in *Franklin* because that defendant was sentenced before *Miller* and *Caballero* were decided. In contrast, the relevant cases discussed above had been decided when defendant was convicted in this case. Indeed, defense counsel relied on *Miller* and *Gutierrez* when he filed his sentencing statement and argued that defendant should not be sentenced to an LWOP term based on the *Miller* factors.

We find the sentencing court properly exercised its discretion in this case. The court reviewed *Miller*, *Gutierrez*, and *Caballero*, defendant's sentencing statement, and the provisions of section 3051. It made extensive findings based on the five factors set

25.

forth in *Miller* and *Gutierrez*, and explained why it was going to exercise its discretion to impose consecutive terms of 25 years to life instead of an LWOP term. As in *Franklin*, the court did not abuse its discretion, defendant need not be resentenced, and his aggregate term is constitutional.

Out of an abundance of caution, however, we remand the matter to the sentencing court for the limited purpose of determining whether defendant "was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Franklin*, *supra*, 63 Cal.4th at p. 284.) While defense counsel was obviously aware of the relevant authorities, his sentencing statement addressed the court's exercise of discretion to impose the sentence in the first instance, and may not have considered additional factors that might be relevant to defendant's eventual parole hearing, as discussed in *Franklin*. Defense counsel was a vigorous advocate for defendant, and the documents submitted with his sentencing statement may have been the only available evidence relevant to the *Miller* factors.

Nevertheless, given the holding in *Franklin*, and the factors which the Board must consider at the parole hearing that will be held many years hence in the 25th year of his incarceration, we will order a limited remand for *both parties* "to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors (§ 4801, subd. (c)) in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime .…" (*Franklin*, *supra*, 63 Cal.4th at p. 284.)

## DISPOSITION

The matter is remanded for the limited purpose of affording both parties the opportunity to make an accurate record of defendant's characteristics and circumstances at the time of the offense, as set forth in *Franklin*.

26.

On remand, the court shall correct the abstract of judgment as stated in the reporter's transcript of the sentencing hearing, that defendant was sentenced to 25 years to life for count I; a consecutive term of 25 years to life for the section 12022.53 firearm enhancement; life with the possibility of parole for count II, plus 25 years to life for the second section 12022.53 enhancement, for an aggregate term of 75 years to life plus life with parole. The trial court shall forward to all appropriate parties a certified copy of an amended abstract of judgment.

In all other respects, the judgment is affirmed.

_____

POOCHIGIAN, J.

WE CONCUR:

_____

LEVY, Acting P.J.

_____

PEÑA, J.

27.